The People of the State of New York, Respondent, v.
John Wenzel, Appellant.

1. Murder — Sufficiency of Evidence.  The evidence upon the trial
of a defendant for murder in which the defendant admitted the killing,
but claimed that he was acting in self-defense, examined, and *held*, that
the evidence required the submission to the jury of the facts in the case,
and that it justified the verdict found to the effect that the defendant with
deliberation and premeditation intentionally killed the decedent.

2. Errors in the Admission of Evidence Insufficient to Justify
Reversal of Conviction — Code Crim. Pro. § 542.  Various rulings
made during the trial, admitting and excluding evidence, examined, and
*held*, under the circumstances of this case, that the errors complained of
were cured and did not affect the substantial rights of the defendant.

(Argued May 27, 1907; decided October 8, 1907.)

Appeal from a judgment of the Kings County Court, rendered June 25, 1906, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Herbert N. Warbasse* and *John D. Barber* for appellant.
It was prejudicial error for the prosecution to blacken the
character of the accused by vague generalizations of misconduct and by proof of specific wrongful acts towards third
persons.  (*People* v. *Larubia*, 140 N. Y. 87; *People* v.
*Druse*, 103 N. Y. 655; *People* v. *Greenwald*, 108 N. Y. 296;
*Thomas* v. *People*, 67 N. Y. 218; *Eggler* v. *People*, 56 N. Y.
642; *People* v. *Corey*, 148 N. Y. 476; *People* v. *Dewey*, 179
N. Y. 345.)  It was prejudicial error to allow the prosecution's witness Michael Donlan to testify that Spatz's purpose
in putting his hand behind him was " evidently to raise himself out of the chair."  (*Abbott* v. *People*, 86 N. Y. 460;
*Smith* v. *Comrs.*, 23 Ky. L. 2271; *Hawkins* v. *State*, 25 Ga.
207; *Tucker* v. *State*, 89 Md. 471; *Gardner* v. *State*, 90 Ga.
310; *Hudgins* v. *State*, 2 Ga. 173; *State* v. *Brooks*, 39 La. Ann.
817; *People* v. *Walker*, 133 Ill. 110.)  It was error not to
allow the accused to prove by the witness Michael Donlan, on

cross-examination by defendant's counsel, that he could have heard any threats or remarks that were made on the Saturday night when defendant was directed to leave decedent's saloon. (*Maynard* v. *People*, 135 Ill..416 ; *Stever* v. *N. Y. C. R. R. Co.*, 7 App. Div. 392; *Casey* v. *N. Y. C. R. R. Co.*, 6 Abb. [N. C.] 104; 78 N. Y. 518.) It was prejudicial error to allow the prosecution's witnesses Fred Harjes and Officer Owen Carney to detail on re-direct examination their reasons for their hostility toward the prisoner ; and to allow the prosecution to prove on re-direct examination of the witness Fred Harjes that when he testified on cross-examination about wanting to see defendant convicted for the death of Spatz, he meant defendant " ought to go to the electric chair for killing Spatz ; " and to prove on the re-direct examination of Officer Owen Carney that " from his investigation as a police officer he was convinced of the defendant's guilt of this crime." (*Chilton* v. *State*, 45 Md. 564; *Butler* v. *State*, 34 Ark. 480 ; *Polk* v. *State*, 62 Ala. 237 ; *Putman* v. *State*, 61 Ga. 379 ; *People* v. *Goldenson*, 76 Cal. 328 ; *State* v. *Frank*, 109 La. Ann. 131 ; *State* v. *Glynn*, 51 Vt. 577 ; *Eldridge* v. *State*, 27 Fla. 162 ; *State* v. *Jackson*, 39 La. Ann. 910 ; *State* v. *Gregory*, 33 La. Ann. 737.) It was error destroying a substantial right not to allow the defendant to testify to the information which he received from O'Neil upon which the defendant acted in arming himself and going to the vicinity where Spatz's saloon was located. (*People* v. *Wood*, 126 N. Y. 249 ; *Hudgins* v. *State*, 2 Ga. 173 ; *Carter* v. *Beals*, 44 N. H. 408 ; Underhill on Ev. 66, § 51 ; 1 Elliott on Ev. 436, § 322 ; 2 Taylor on Ev. [9th ed.] 391, § 44 ; *People* v. *Shea*, 8 Cal. 538 ; *People* v. *Powell*, 87 Cal. 348 ; *Foran* v. *State*, 29 Tex. App. 250 ; *Simmons* v. *State*, 31 Tex. Cr. Rep. 227 ; *People* v. *Jackson*, 111 N. Y. 362 ; *State* v. *Fox*, 25 N. J. L. 566 ; *Badger* v. *Story*, 16 N. H. 168.)

*John F. Clarke, District Attorney* (*Frank X. McCaffry* of counsel), for respondent. The evidence well supported the verdict, abundantly established guilt, and the substantial rights

of the defendant have not been prejudicially affected. (*People* v. *Smith*, 180 N. Y. 125; *People* v. *Koenig*, 180 N. Y. 155; *People* v. *Rimieri*, 180 N. Y. 163; *People* v. *Breen*, 181 N. Y. 493; *People* v. *Conklin*, 175 N. Y. 333; *People* v. *Ciardi*, 188 N. Y. 145; *People* v. *Broncado*, 188 N. Y. 150; *People* v. *Kennedy*, 159 N. Y. 346; *People* v. *Constantino*, 153 N. Y. 24.) The substantial rights of the defendant were not prejudiced by permitting the witnesses Frederick Harjes and Owen Carney to testify, on re-direct examination, as to alleged hostility toward the prisoner. (*State* v. *Gregory*, 33 La. Ann. 737.)

HAIGHT, J. John Wenzel, the defendant, at the time of the trial, according to his own testimony, was thirty-three years of age, five feet eleven inches tall, weighing one hundred and eighty-four pounds, and had always been in good physical condition. He was born and brought up in Brooklyn within a short distance of the place where the homicide took place. In 1892 he enlisted in the navy as a coal passer, served in that capacity for the term for which he was enlisted and was honorably discharged. In April, 1898, he enlisted in the military service of the United States and was dismissed after serving two years and ten months. In December, 1902, he enlisted in the United States marine service, but was dismissed therefrom after a service of twenty-three months. The decedent, George Spatz, kept a saloon at the corner of Marcy avenue and Hopkins street; was married and had two children. The defendant began visiting the saloon of Spatz in 1899 and thereafter became a frequent customer, making the saloon, as he expressed it, his " hanging-out place." In February, 1905, he was arrested, charged with the crime of burglary, and upon his plea of guilty was sentenced to the penitentiary, from which place he was discharged on the last day of April, 1906. He relates three occasions on which he had had some trifling disputes with Spatz before he was sent to the penitentiary, but states that he never harbored any ill-feeling towards him. On Monday evening, April 30, 1906, after

his discharge from the penitentiary, between ten and eleven o'clock he visted Spatz's saloon and found there Edwin Maher and Charles Blank engaged in playing a game of cards. He asked for a drink which was refused, Spatz saying to him, "You have got enough now," and that he wanted him to get out. At this point the testimony of Maher and Blank widely differ from that of the defendant as to what took place; that of Maher and Blank being to the effect that the defendant undertook to draw a pistol from his pocket, they jumped up, interfered, struck him with their fists, knocked him down and put him out on the street; that of the defendant, to the effect that Spatz provided them with clubs and that the three attacked him with clubs, knocking him down, beating him, and that thereupon Mrs. Spatz interfered and saved him from being killed. After he had been put out of Spatz's place he spent the remainder of the night in neighboring saloons, and early the next morning returned to Spatz's place in company with one John Patterson, and, as he says, he asked Spatz why he had beaten him so the night before, to which Spatz replied, you get out of here or you will get another. To this he replied, in substance, that he had no fear of getting another beating then, for the reason that Spatz's people of the night before were not there. He again asked Spatz to tell him why he got the beating, and Spatz told him he would not. He subsequently went home, arriving there about eight o'clock. The evidence tends to show that he was badly bruised, and consequently remained home until Friday afternoon and then went to the cemetery with his mother and sister. He returned home with them that night and remained until Saturday afternoon. He then went down to near the ferry, intending to visit some of his friends on the Kearsarge on which he had previously served. On the way down he met O'Neill and had a talk with him, and then he purchased a revolver and some cartridges. He then went to Venus Hall on Flushing avenue and entered the toilet room and tried to load his revolver with the cartridges, but finding them too large he returned and exchanged

them for others that would fit, then put them in his revolver and again started for the neighborhood in which he had had his previous trouble, taking Andrew Nelson and Michael Donlan with him. They visited several places and finally brought up at Spatz's saloon some time during Saturday evening. He says that he wanted to see Spatz in order to find out where Maher and his other associate were, who were looking for him to beat him again, that he understood that Maher was carrying a gun and that he was going to take it from him. Then, as he tells us, Spatz went to the end of the bar, took out three clubs, handed one to each of two young men who were standing there and told them to take the clubs and they would clean " this bunch out." The defendant then told the young men not to take the clubs because this was none of their argument, and one of them replied, " all right." Thereupon Mrs. Spatz came into the room and asked what the trouble was, and he said to her that he wanted Spatz to keep the bunch away from him; that he heard they were going up to his house to kill him; that he had a mother there about seventy-six years old, and if she ever saw anything of the kind she would drop dead. He thanked Mrs. Spatz for saving his life on Monday night, but said her husband was a coward. They then left the place. Before leaving, however, he said that Spatz picked up the clubs and had one in his hand; that he started to make towards him with the club, saying, " Well, you come in here again now, we will kill you." I says to him, " we will kill you." " Do you want to kill me?" I says to him. He says, " Yes, if I get you in here any time, I kill you." He then went out and stayed in Conner's saloon over night, and on the following Sunday morning he, in company with Michael Donlan, returned to Spatz's saloon, entering a rear room at the back door. He found a German sitting at the table drinking beer, and Spatz was sitting in a chair tilted back against the wall by the side of the door that entered into the bar room. His story is, that he asked Spatz to serve them with drinks and to let him explain himself to him; that he went to a table with the intention of sitting down, but

Spatz replied, " You big son of a bitch, I will serve you with drinks," and attempted to draw from his hip pocket a revolver ; that as he was pulling it out it caught in the strings of his apron, and thereupon the defendant drew his revolver and shot Spatz three times. He then ran from the saloon, took a Park avenue car and disappeared.

The testimony of Frederick Harjes, the German, however, materially differs from that of the defendant with reference to the homicide. He had been to early morning church and had then stepped into Spatz's place to have a visit and a glass of beer. He sat at a table and Spatz had handed him a glass of beer and had taken a cigar in one hand and a match in the other and had sat down in a chair at the place already indicated. He said that they had been sitting there about two minutes talking when the defendant and another fellow came in and wanted beers ; that Spatz said to the defendant, " I told you many times not to come in here, leave my house, you cannot have any beer in my house." Just as soon as Spatz replied, the defendant drew a pistol and it went " puff, puff, puff." He saw him fire the revolver three times, and after firing the shots they went out. It appears that the decedent was seated in a chair in the act of lighting his cigar at the time the defendant and his companion entered the room and called for beer ; that during the firing he attempted to rise from his chair, called for help, and then fell to the floor. An ambulance was summoned and he was removed to the hospital, where he died the following day. An autopsy disclosed that one bullet entered the back at the right side of the shoulder blade and was lost in the muscles of the back, one bullet passed through the right forearm three inches below the elbow, and the other bullet entered the right side of the abdomen, one inch below the border of the ribs and two inches to the right of the breast bone, passing through the liver, and was found in the spine directly opposite. This wound was the cause of death. Harjes further testified that Spatz did not attempt to draw any revolver, that he had at no time made any effort to take anything out of his back pocket and did not put his

hand towards such pocket. It further appears that the officers searched the decedent before his removal to the hospital and that he had no revolver in his possession or about his person at the time of the homicide.

We have only briefly alluded to the most important portion of the testimony. The statement of the defendant that the decedent attempted to draw a revolver is shown to be false by a number of disinterested and, so far as we know, credible witnesses sworn on behalf of the People, and if false, then the defendant's claim, that he was acting in self-defense, utterly fails. The defendant, as we have seen, admits the killing. According to his own statement he had been time and again ordered out of the decedent's saloon. Repeatedly he had been refused drinks when called for, yet he persisted in calling and demanding drinks when he knew that he was an unwelcome visitor. According to his own statement he had been severely pounded and put out of the place the Monday evening before the homicide. In consequence of the injuries then received he remained at his house until the following Saturday afternoon. Then he started out, purchased a revolver, procured the cartridges that would fit it, loaded it and then with two of his associates started out to find the persons who had inflicted the injuries upon him. Our conclusion is that the evidence required the submission to the jury of the questions of fact in the case, and that it justified the verdict found, to the effect that the defendant with deliberation and premeditation intentionally killed the decedent.

There were several erroneous rulings made during the trial, and the question that we shall discuss with reference to them is as to whether, under the circumstances of this case, they were so prejudicial of the rights of the defendant as to require the ordering of a new trial.

During the trial Mary Spatz, the widow of the deceased, was sworn as a witness on behalf of the People and testified that she had known the defendant off and on for about seven years ; that he was always more or less troublesome when he came into their place. The question was then asked as to

what she meant " by that." To this the defendant inter-
posed an objection as improper. The objection was over-
ruled and the defendant took an exception. The witness
answered : " He was always insulting people in front of the
bar. Q. This was in your presence ? A. In my presence
most of the time." We do not understand that evidence of
specific quarrels with other persons at some remote time, hav-
ing no connection with the act resulting in the homicide and
not tending to show any motive therefor, was competent at
this stage of the trial. (*People* v. *Larubia*, 140 N. Y. 87–92.)

But subsequently the defendant took the stand in his own
behalf and gave us the history of his own life and conduct,
showing that his character and conduct were fully as bad as
that indicated by the answer of Mrs. Spatz, thus rendering
her statement harmless, and counteracting the evil that
otherwise might have resulted.

Upon the trial Michael Donlan was also sworn as a witness.
It will be recalled that he was the companion of the defendant,
who had been with him the Saturday evening before the
homicide, and the one who accompanied him into Spatz's
place on the Sunday morning when the shooting took place.
As we have seen, Donlan and the defendant entered Spatz's
place through a rear door passing into a room back of the
bar room. Spatz was seated in a chair tilted back against the
wall, next to the doorway entering into the bar room. He
testified that as the defendant called for two drinks, Spatz
replied, you get out of here as quick as you can. He then
stated, in substance, that Spatz had his hand behind him and
he raised up off of the chair, and the defendant said, " No
you don't, I got you first," and then fired the shots which
caused the death. He was then asked if he wanted the jury
to understand that Spatz put his hand into his pocket. He
answered, " No, I could not say that ; I do not say where he
put his hand." Some further questions upon the subject were
asked, and finally the witness answered : " I don't know
whether he wanted to raise himself from the chair. I would
not say for sure. All I said, he put his hand behind him."

Then followed the question, " Spatz, as Wenzel said this, put his hand back of him, evidently to raise himself out of the chair, and at the same time saying, get out of here as quick as you can. Is that right ? " This question was objected to, the objection was overruled, and the defendant excepted. The witness answered, " Yes, sir." The question was somewhat leading, and called for a conclusion of the witness as to the intention of Spatz in putting his hand behind him. But we do not think the jurors were misled upon that subject, for he had answered quite fully in reference to what he saw and what he did not see. The same witness testified that on the evening before he was with the defendant in the saloon of the decedent when Spatz ordered them out, and that then he did not hear any remarks from the defendant; that he was a couple of feet behind him, and he could have heard any remarks that were made. At this point an objection was interposed by the district attorney, which was sustained and an exception taken. The answer, however, had previously been taken, and it was not stricken out, so that the evidence stands in the record and was before the jury. The testimony was called out upon the cross-examination, and was in answer to evidence tending to show that the defendant, as he went out, uttered a threat against Spatz.

Upon the cross-examination of the witness Harjes, who, as we have seen, was the German in the room drinking a glass of beer at the time of the homicide, he was asked by the defendant's counsel if he remembered making a remark, to the effect that he would like to see the defendant go to the electric chair. He answered : " I like that to see. It is good for him. I like to see that. It is too good for that man. He is a first bum." Upon re direct examination the district attorney asked him, " When you say you want to see him go to the electric chair, do you mean he ought to go there for killing Spatz ? " This was objected to as an incompetent conclusion, the objection was overruled and the defendant excepted. The witness answered, " Yes, sir ; that is my idea." Again, upon re-cross examination, he testified that he did not like this

man before the shooting, that he never liked him and that he hated him long years ago. Upon the re-direct examination the district attorney asked him why. To this an objection was interposed, overruled and an exception taken. He then stated that a couple of years ago the defendant had wanted to work for him, that he refused to have him; and then in answer to another question as to what he meant, the witness answered, " He goes and steals. That's why I don't want him." Upon re-direct examination, immediately following, he stated that he had never seen him steal, and that all he knew about it was what he had heard. The purpose of the defendant's counsel in cross-examining the witness undoubtedly was to show that he was a prejudiced witness, disliking the defendant, and that, therefore, the jurors ought not to give implicit confidence to his testimony. But he having opened this subject by an examination of the witness, the district attorney then had the right to show, if he could, that the witness had no prejudice whatever other than that which would naturally exist on the part of any person who saw the homicide. It must be conceded that the district attorney went beyond this, especially in calling out the statement that the defendant " steals." In most cases this might be regarded as so incompetent and prejudicial as to call for a reversal, still in this case we have the voluntary admission on the part of the defendant himself that he had stolen, that he had committed a burglary and that he had been convicted upon his own plea of guilty, thus showing that it was a matter of public knowledge. And inasmuch as the witness followed the statement with the further declaration that he had never seen him steal and that all he knew about it was what he had heard, we incline to the view that the verdict was not affected by the error complained of.

Owen Carney was the officer who succeeded in arresting the defendant. He testified to a number of declarations made by the defendant at that time, to the effect that he did not shoot Spatz, that he never had a pistol in his life, and that he was not in the saloon that morning. Upon cross-examination

he was asked if it was to his credit that this man should be convicted, and his answer to this was excluded by the court. But he was permitted to testify that he was anxious to convict the defendant. The district attorney then asked why, and he was permitted to answer, "Because he deserves it." Then, on cross-examination, he was asked, "How do you know he deserves it." To which he answered, "Because he shot the man in cold blood, I believe. Q. How do you know he shot him in cold blood? A. From the evidence given in the case. Q. You did not see him shoot him? A. No, sir." Upon re-direct examination a question was asked which was objected to, and the question was withdrawn. And the further question was asked, "You have said in answer to the question asked you by counsel for the defendant that you reinforced your belief that this defendant ought to be convicted of this crime." To which the witness answered, "Yes, sir." "Q. I want you to tell the jury why you believe that. A. From my investigation as a police officer. Q. You are convinced of the guilt of the defendant? A. Yes, sir." These latter questions and answers were not objected to. It was perfectly proper for the defendant's counsel to show that the witness was anxious for a conviction, and in answer thereto it was perfectly proper for the district attorney to show that the only interest that he had was that of a police officer in discharging his duty. The belief of the witness, or his judgment, as to what the evidence showed, was of no consequence and was not a proper subject for the consideration of the jury. In this case the district attorney was allowed to go too far in his examination. He called out opinions of the witness which he had no right to have considered by the jury. But the most objectionable part of the testimony was not objected to by the defendant's counsel. He had opened the door for an inquiry as to the nature of the anxiety of the witness to have the defendant convicted. The district attorney had the right thereupon to show that he had no other interest than that of a public officer, anxious only to convict those who are guilty. Instead of stopping at this point or the

striking out of irresponsive answers, both counsel continued the examination into the forbidden field. But it distinctly appeared before the jury that this witness knew nothing of the case further than the declarations of the defendant made at the time of the arrest. This fact taken in connection with the admissions made by the defendant in his testimony, to which we shall hereafter refer, incline us to adopt the view that these errors may also be disregarded.

It will be recalled that the defendant, after his recovery from his injuries received on Monday evening, started out Saturday afternoon to visit, as he stated, some of his friends who were on the Kearsarge. On his way, he testified that he met one O'Neill driving a truck. An objection was taken to the question as to what he learned from O'Neill, which was sustained by the court. No offer was made calling the attention of the court to what was sought to be shown by this statement. It is now claimed that the defendant was advised that Maher and Blank were looking for him ; that Maher had a revolver, and that he better be upon his guard, and that it was by reason of this information that he then purchased the revolver with which he did the shooting. It is quite possible, had the attention of the court been called to the purpose of the testimony, it would have been received. The defendant doubtless had the right to show the reason why he purchased the revolver, but we have the testimony of the defendant quite fully upon the subject. He tells us distinctly that he purchased the revolver and the cartridges for the purpose of looking up Maher and taking from him the gun that he had in his possession, and it appears that he soon thereafter, in company with two associates, started out to find the bunch, as he termed the persons who had inflicted the injuries upon him the Monday evening before. It is thus apparent that he did not purchase the revolver solely for the purpose of protecting himself in case of an attack, but that he purchased it for the purpose of taking affirmative action against the other parties referred to. We are also of the opinion that the court improperly admitted the testimony of Officer Carney as

to the statement made by Michael Donlan, to the effect that he had stated to the defendant that the shooting was a cowardly trick. Donlan was sworn as a witness for the People. He, therefore, could not be contradicted upon collateral matters. While upon the witness stand he did not recall making the statement to the defendant. No reply thereto was given by the defendant, and consequently it only amounts to his judgment as to the transaction. We think that there was no error in the charge of the court in submitting the case to the jury that calls for a reversal.

As we have seen, the defendant concedes that he did the shooting which caused the death of Spatz. He tells us of the circumstances under which he purchased the revolver and the cartridges, and of his starting out with his associates looking for Maher and others. Not finding Maher and Blank, they went to the saloon of the decedent during the evening and were ordered out. After Mrs. Spatz appeared upon the scene they took their departure. But again the next morning the defendant, in company with his remaining associate, Donlan, again called and demanded drinks. He then knew that on three occasions during the week he had been refused drinks and ordered from the premises. He knew that on the Monday evening before he had been driven from the premises after receiving a severe beating. He knew that he was not wanted there and had no business to enter the premises. Yet again we find him there and demanding drinks, and when refused, he fired the shots that deprived Spatz of life. All this appears from his own testimony. Of what importance, then, was the testimony contradicting Donlan as to how he characterized the act, or of what consequence was the testimony of Officer Carney as to his belief as to the guilt of the defendant, or of the other rulings, to which attention has been called? Prejudicial, we concede, had there been a doubt about the essential facts of the homicide. But the facts being admitted, they become unimportant, harmless errors, which, under other circumstances in other cases, might be deemed fatal.

There was really but one question of fact left open for consideration upon the trial, and that was as to whether Spatz had a revolver upon his person and attempted to draw it upon the defendant at the time the defendant did the shooting. As to this issue we have already commented upon the facts, to the effect that the verdict was amply sustained by the evidence, which tended to show that the decedent was unarmed. But even if Spatz did have a revolver and attempted to draw it, there was nothing to prevent the defendant from retiring and leaving the premises, in accordance with the demand of the proprietor. There was nothing that occurred that justified the defendant in shooting Spatz, nor was he justified in believing that he was about to receive great bodily harm while retreating from the premises. We, therefore, conclude that the errors complained of, under the circumstances of this case, do not affect the substantial rights of the defendant. (Code of Criminal Procedure, § 542.)

The conviction and judgment should be affirmed.

CULLEN, Ch. J., O'BRIEN, EDWARD T. BARTLETT, WERNER, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.